[Cite as *In re A.R.*, 2009-Ohio-3536.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

---

**IN THE MATTER OF:**

    **A.R.,**                              **CASE NO. 13-09-03**

**ALLEGED NEGLECTED AND
DEPENDENT CHILD,**

**[MICHELLE SIEBENECK, APPELLANT**      **O P I N I O N**
**MICHAEL HOWARD, APPELLANT].**

---

**IN THE MATTER OF:**

    **M.S.,**                              **CASE NO. 13-09-04**

**ALLEGED NEGLECTED AND
DEPENDENT CHILD,**

**[MICHELLE SIEBENECK, APPELLANT].**      **O P I N I O N**

---

**IN THE MATTER OF:**

    **A.S.,**                              **CASE NO. 13-09-05**

**ALLEGED NEGLECTED AND
DEPENDENT CHILD,**

**[MICHELLE SIEBENECK, APPELLANT].**      **O P I N I O N**

---

IN THE MATTER OF:

A.R.,                                              CASE NO. 13-09-06

ALLEGED NEGLECTED AND
DEPENDENT CHILD,

[MICHELLE SIEBENECK, APPELLANT].        O P I N I O N

IN THE MATTER OF:

Q.S.,                                              CASE NO. 13-09-07

ALLEGED NEGLECTED AND
DEPENDENT CHILD,

[MICHELLE SIEBENECK, APPELLANT].        O P I N I O N

**Appeal from Seneca County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 20450075**
**Trial Court No. 20450076**
**Trial Court No. 20550060**
**Trial Court No. 20450074**
**Trial Court No. 20450077**

**Judgments Affirmed**

**Date of Decision:  July 20, 2009**

**APPEARANCES:**

*Shane M. Leuthold* **for Appellant Michael Howard**

*Charles R. Hall, Jr.* **for Appellant Michelle Siebeneck**

*Victor H. Perez* **for Appellee SCDJFS**

*Kent D. Nord* **for Appellee Kent D. Nord, Guardian ad Litem**

**WILLAMOWSKI, J.**

{¶1} The mother-appellant, Michelle Siebeneck, appeals the judgments of the Seneca County Common Pleas Court Juvenile Division granting permanent custody of her five children to the appellee, Seneca County Department of Job and Family Services ("DJFS")  Also appealing the decision of the trial court in only appellate case number 13-09-03 is the father-appellant, Michael Howard.  On appeal, Michelle contends that the trial court erred because the DJFS did not develop or implement a case plan reasonably calculated to reunify the family; that the decision is against the manifest weight of the evidence; that the record lacked clear and convincing evidence that the children could not be returned to her within a reasonable time; and that placing the children into the permanent custody of the DJFS was not in the children's best interests.  Michael contends that the trial court's decision concerning his child was against the manifest weight of the evidence.  For the reasons set forth herein, the judgment of the trial court is affirmed.

{¶2} On August 12, 2004, the DJFS filed complaints alleging that Michelle's four children, A.R., born on March 6, 1996 ("male A.R."), A.R., born on April 26, 1997 ("female A.R."), M.S., born on May 26, 1999, and Q.S., born on August 26, 2003, were neglected and dependent children.  The children were taken

into the temporary custody of the DJFS on August 13, 2004. On October 6, 2004, M.S. and Q.S. were adjudicated dependent. The trial court adjudicated male A.R. and female A.R. to be neglected and dependent on October 26, 2004 and ordered that all four children remain in the temporary custody of the DJFS. Michael, the biological father of female A.R., filed a motion for custody or extended visitation on August 22, 2005.

{¶3} On September 9, 2005, A.S. was born to Michelle and her husband, David Siebeneck. On that same date, the DJFS filed a complaint alleging that A.S. was dependent, and the court ordered A.S. into the DJFS's temporary custody. On October 6, 2005, A.S. was adjudicated dependent and remained in the temporary custody of the DJFS along with her four siblings.

{¶4} On December 15, 2005, the trial court denied Michael's motion for custody or extended visitation but did order that the case plan be amended to provide services for Michael. Michael appealed the court's decision; however, the appeal was dismissed for lack of jurisdiction. *In re Roose*, 3d Dist. No. 13-06-01, 2006-Ohio-2787. Michael moved to Mississippi following the court's decisions and had no contact with female A.R. for approximately one year.

{¶5} On October 12, 2006, the DJFS requested permanent custody of each of the five children. On January 23, 2007, Michelle filed a motion essentially asking that custody be granted to her mother, Wanda Roose. Attached to the

motion was Wanda's affidavit stating that she was willing to take custody of the children. On May 22, 2007, the DJFS withdrew its motions for permanent custody due to a conflict of interest that had arisen amongst several of the attorneys involved in the case. The DJFS was granted leave to refile the motions. A visiting judge was appointed in the case on December 26, 2007.

{¶6} Michael, who had returned to Ohio sometime in 2006 and had resumed supervised visitation with female A.R., filed another motion for custody on January 15, 2008. After hearing held on November 3, 2008, the court denied both Michelle's and Michael's motions for custody in judgment entries filed on November 20, 2008. Pursuant to R.C. 2151.413 through 2151.415, the DJFS filed motions for permanent custody on December 3, 2008,[1] and on December 8, 9, 10, and 29, 2008, the court held a hearing on the motions for permanent custody. Following the filing of optional, written closing arguments, the court, on January 22, 2009, filed its judgment entries granting permanent custody of each of the five children to the DJFS.[2] Michelle appeals the judgments of the trial court, raising four assignments of error for our review.

---

[1] Despite the late filing of the motion, each of the parties apparently knew that the DJFS would be filing for permanent custody, as the hearing scheduled for December 8, 9, and 10 had been scheduled several months in advance to accommodate the schedules of the Seneca County Common Pleas Court Juvenile Division, the visiting judge, and nine attorneys (Michelle's attorney, Michael's attorney, the DJFS's attorney, one attorney for each child, and the attorney guardian ad litem).
[2] Joseph Allen, the father of male A.R., had surrendered his parental rights on December 8, 2008. David Siebeneck, the father of M.S., Q.S., and A.S. had surrendered his parental rights on February 7, 2007.

*Michelle's First Assignment of Error*

**The trial court erred in granting permanent custody to Seneca County Job and Family Services because the SCJFS failed to develop and implement a case plan reasonably calculated to achieve the goal of reunification of the minor children.**

*Michelle's Second Assignment of Error*

**The trial court's decision to terminate the appellant's parental rights and grant permanent custody to the Department is against the manifest weight of the evidence.**

*Michelle's Third Assignment of Error*

**The trial court erred in granting permanent custody of the children to Seneca County Job and Family Services because clear and convincing evidence was not presented to establish that the children could not be returned to Mother within a reasonable time.**

*Michelle's Fourth Assignment of Error*

**The trial court erred in granting permanent custody for the children because it was not in their best interest.**

Michael appeals the judgment of the trial court in appellate case number 13-09-03, asserting one assignment of error.

*Michael's Assignment of Error*

**The court's grant of permanent custody of [female A.R.] to the Seneca County Department of Job and Family Services was against the manifest weight of the evidence since the father was fully capable and willing to provide an adequate permanent home for the child.**

The attorney guardian ad litem, Kent Nord, and the DJFS each filed an appellee's brief requesting that we overrule Michelle's and Michael's assignments of error and affirm the decisions of the trial court.

{¶7} Before reaching the merits of this appeal, we note that parents have a fundamental right to care for and retain custody of their children. *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 621 N.E.2d 426, citing *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. The United States Supreme Court has noted, "'[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents[.]'" *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551, quoting *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed.2d 645. Therefore, permanently removing a child from his or her parents' care is an alternative of last resort, sanctioned only when the welfare of the child requires such action. See *In re Wise* (1994), 96 Ohio App.3d 619, 645 N.E.2d 812; *In re Cunningham* (1979), 59 Ohio St.2d 100, 391 N.E.2d 1034. The "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (quotation omitted).

{¶8} Permanent custody determinations under R.C. 2151.414 must be supported by clear and convincing evidence. *In re Hiatt* (1993), 86 Ohio App.3d 716, 725, 621 N.E.2d 1222. In reviewing a trial court's decision made under the clear and convincing standard, an appellate court must "examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Id. at ¶ 18, citing *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Clear and convincing evidence has been defined as:

> **"that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."**

Id., quoting *Cross,* at 477, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. However, the trial court "is in the best position to observe the demeanor of the parties, to access [sic] their credibility, and to determine the accuracy of their testimony." *In re Adoption of Sours,* 3d Dist. Nos. 16-02-16, 16-02-17, 2003-Ohio-3583, at ¶ 10, citing *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 367, 481 N.E.2d 613. If the trial court's determination was supported by competent, credible evidence, and the trial court did not abuse its discretion, its determination will be affirmed. *Jones v. Lucas Cty. Children Serv. Bd.* (1988), 46 Ohio App.3d 85, 86, 546 N.E.2d 471; *In re Robison,* 3d Dist. No. 5-07-41, 2008-Ohio-516, at ¶ 8, citing *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85, 630

N.E.2d 665. An "'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (internal citations omitted).

{¶9} Once a motion for permanent custody has been filed by the agency, the court must look to R.C. 2151.414 for guidance. If the court determines by clear and convincing evidence that permanent custody is in the best interests of the children and the children have been in the temporary custody of the agency for twelve or more months of a consecutive 22-month period, the court may grant the agency's motion. R.C. 2151.414(B)(1)(d). "For the purposes of division (B)(1) of [R.C. 2151.414], a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." Id.

{¶10} The court may also grant the agency's motion if it determines that permanent custody is in the children's best interests and, after considering the non-exclusive list of factors in R.C. 2151.414(E)(1)-(16), that the children cannot be placed with the children's parents within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(2). Finally, in considering the children's

best interests, the trial court must consider the following non-exclusive list of factors:

> **(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**
>
> **(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D).

{¶11} In its judgment entries, the trial court cited R.C. 2151.414(E)(1) and determined that the children could not be placed with Michelle because she had "continuously and repeatedly failed to substantially remedy" the conditions that

- 11 -

led to the removal of the children. The court noted that Michelle had not utilized the services available to her, had attended counseling inconsistently, and had been terminated from counseling due to non-attendance. The court considered R.C. 2151.414(E)(2) and determined that Michelle's chronic issues with depression, and apparently anxiety, made her unable to provide an adequate, permanent home within one year. The court noted Michelle's admission that she was not ready to take the children home and also noted that Michelle was not able to demonstrate that the next six months would be any more productive than the prior four years had been.

{¶12} The court also considered the best interests of the children under R.C. 2151.414(D), specifically noting under R.C. 2151.414(D)(1) that A.S. had never lived with her mother; that there was an unusually strong bond between the children; that Michelle had never progressed past supervised visitation; and that although the desires of male A.R., female A.R., and M.S. had vacillated in regard to whether they wished to be returned to Michelle or to remain with their current foster family, their desires to keep all of their siblings together had not changed. The court stressed that the children needed a legally secure and permanent placement and determined that adoption provided the best opportunity for that to occur. The court noted that the current foster parents were not opposed to

adopting all five of the children. The court also noted several other statutory factors and found that they were inapplicable.

{¶13} At the final hearing, evidence was presented that each of the children had special emotional, behavioral, educational, and/or developmental needs. Permanent Custody Hearing Tr., Apr. 15, 2009, at 25-31. Male A.R., female A.R., and M.S. were in counseling for their issues and would need continued counseling. Id. at 23.

{¶14} Connie Maksemetz used to work for the DJFS in the "Wraparound" program. Maksemetz opened her case with Michelle and her husband, David, in January 2004. Id. at 66. She noted that the children had been inappropriately clothed, had been dirty, and that the trailer in which the family resided had not been clean. Id. at 67. Maksemetz stated that Michelle was depressed and most of the case plan she instituted, which was voluntary at that time, was not followed. Id. at 67; 80. The family missed appointments at their residence either because they "forgot" or had other things to do. Id. at 72. Maksemetz had her last contact with Michelle on April 26, 2005. Id. at 78.

{¶15} Judith Reiter, the guardian ad litem assigned to the children by the DJFS, testified that she believed all five children should be placed into permanent custody. Id. at 88. Reiter stated that Michelle had never been ready for reunification and keeping the children together as a group was more important

than their placement with Michelle. Id. at 112; 126. Reiter told the court that she believed Michelle's motion requesting that the children be placed with Wanda was an indication that Michelle "did not think she would win." Id. at 132-133.

{¶16} Lynn Snyder, a social worker at Century Health, testified that Michelle completed an intake assessment on July 24, 2008. Id. at 143. Snyder observed no indications of depression but did notice some anxiety based on the pending litigation. Id. at 44. Between July 24, 2008 and the hearing, Michelle had been to four sessions, including two intake sessions and two therapy sessions. Id. Although Snyder did not diagnose Michelle with depression, she was aware of a prior episode of depression and wanted to observe Michelle. Id. at 146. Snyder testified that she had not seen Michelle since November 6, 2008, and Michelle had rescheduled or cancelled a few previously scheduled sessions.

{¶17} Jesusa Behee, an ongoing social worker at the DJFS, testified that she was assigned to Michelle's family in April 2003 as a family preservation social worker. Id. at 169. At that time, Michelle had been unable to keep the trailer clean and had been unable to deal with the children's behavior. The family had trouble maintaining a monthly budget and often ran out of money before the end of the month. Id. at 171. The case plan implemented by Behee was voluntary. Behee testified that the children were removed from Michelle because the residence had never clean, there had been large leaks in the roof above the

children's bedroom and above the living room to the point that a black substance had been leaking into the living room. Id. at 174. Other reasons for removal included the presence of cockroaches in the trailer, male A.R. not receiving his medication properly, and Michelle and David not completing mental health counseling. Id. Behee noted Michelle's willingness to seek counseling as well as her subsequent failure to follow through. Id. at 217.

{¶18} Dr. Darlene Barnes conducted a psychological evaluation of Michelle on October 31, 2005. The evaluation revealed that Michelle had major depressive disorder, among other diagnoses, which Barnes believed was chronic. Id. at 221.

{¶19} Larry Glass, the children's current foster father, testified that the children had exhibited some issues with their anger. Id. at 255-262. Glass stated that the children usually act out following the supervised visitations with Michelle. Id. at 276. Male A.R., female A.R., and M.S. had discussed adoption with Glass, and female A.R. and M.S. had been, at times, amenable to being adopted by the Glasses. Id. at 258; 310. In the Glasses' care, the children were responsible for certain chores, were getting involved in extra-curricular activities, had improved their grades, and had generally exhibited better behaviors. Id. at 270. At the last visitation session prior to the hearing, Michelle had given each of the children a letter in which she basically told them goodbye, that she had fought to keep them,

and that she wished they had a good life and would contact her once they reached the age of majority. Glass indicated that male A.R. and female A.R. were upset following receipt of their letters but also relieved to have some closure to the litigation and a sense of permanency in their lives. Id. at 273.

{¶20} Lisa Stein, the ongoing social worker from the DJFS testified that Michelle had essentially failed to receive counseling, as required by the case plan, between 2004 and 2007. Stein testified that Michelle had no doctor's verification to prove that she had continued reevaluations for her prescription for Lexapro, which was prescribed to help with the depression issues. Id. at 349. Michelle did not seek a doctor's assistance for panic disorder, which Barnes had also diagnosed, nor did she seek counseling with David. Id. at 350; 352. The case plan required Michelle to complete three parenting classes; however, Michelle could only prove that she had completed one parenting class. Id. Stein testified that Michelle had failed to demonstrate that she now had the ability to handle the children. Id. at 351. Even after Michelle and David separated, Michelle did not exhibit any change in addressing the goals of the case plan. Id. at 356. Stein indicated that she did not believe Michelle could remedy her problems within the next six to twelve months. Id. at 373.

{¶21} Stein addressed Michelle's living situation and her financial situation as well. Although Michelle had been working at Wendy's for

approximately 20 months, she earned $7.00 per hour. Id. at 383. Michelle had lived with Wanda in Wanda's two-bedroom apartment since she left David in 2006. Id. at 412. Stein testified that a two- bedroom apartment was inappropriate housing for five children plus two unmarried adults, particularly since the landlord was not receptive to the addition of five children in the apartment. Id. at 412. Michelle's plan to seek a larger residence was merely on her "to do" list, and she had not taken any steps to actually find adequate housing. In Stein's opinion, Michelle had not substantially complied with the case plan. Id. at 413. Following Michelle's testimony, which is discussed below, Stein testified again. Stein indicated that based on Michelle's inability to complete her own counseling and take her own medication, she felt Michelle would be incapable of taking the children to their counseling sessions and administering their medications. Permanent Custody Hearing Tr. II, Apr. 15, 2009, at 182. Stein stated that Michelle had never attended a semi-annual review of the case plan. Id. at 186.

{¶22} Michelle testified that she knew the requirements of the case plan. Id. at 10. Michelle testified that she gave the children the letters at the last visitation because she believed the visit could be her last. Id. at 18-19. Michelle told the court she had not taken Lexapro for one to two years because she did not feel she needed to be on the medication since the past issues that had caused her depression had ceased. Id. at 21; 31; 82. Michelle testified about her employment

and wages, specifically as to the amounts of her paychecks. Michelle also testified about her monthly expenses, which seemingly exceeded her income. Id. at 22-23. Michelle admitted that she was not in full compliance with the case plan and requested a graduated placement over a six-month period so both she and the children could adjust to each other. Id. at 63-63; 25.

{¶23} Based on the record and all of the evidence, it appears that the DJFS did develop and implement case plans reasonably calculated to reunify the children with Michelle. There was credible and competent evidence in the record to demonstrate that the children could not or should not be placed with Michelle within a reasonable time. There was credible and competent evidence in the record to demonstrate that the children had been in the temporary care of the DJFS for more than twelve months out of a consecutive 22-month period of time, and there was credible and competent evidence from which the court could conclude that terminating Michelle's parental rights and placing the children into the permanent custody of the DJFS was in the children's best interests. Since there was clear and convincing evidence in the record to support the trial court's determinations, we cannot hold that the trial court's decisions were against the manifest weight of the evidence or that the trial court abused its discretion in granting the DJFS's motions for permanent custody. Each of Michelle's four assignments of error is overruled.

{¶24} The following testimony was introduced in regard to Michael. Judith Reiter testified that as of the November 2008 hearing, she had been in favor of Michael obtaining custody of female A.R. However, on November 2, 2008, Michael was arrested in Hancock County, Ohio and did not disclose that fact to anybody before or during the hearing. After the November 2008 hearing, Michael was indicted on two fifth-degree felony charges in Hancock County. Reiter subsequently changed her opinion, not because of the underlying criminal charges, but because Michael had failed to disclose his arrest. Permanent Custody Hearing Tr., Apr. 15, 2009, at 93; 104. Reiter voiced concerns that Michael had been living in Mississippi when female A.R. was initially removed from Michelle's custody, and he had apparently been difficult to locate. Id. at 123. She also voiced concerns about Michael moving back to Mississippi in 2005 and living there for approximately one year with no contact with female A.R. after the court denied his first motion for custody. Id. at 123-124; 129. On cross-examination, Reiter was concerned that if Michael were found guilty on the criminal charges, and if Michael were sentenced to prison, female A.R. would be separated from him again. Id. at 125.

{¶25} Lisa Stein testified that Michael had had supervised visitation with female A.R. prior to his leaving Ohio in 2005. Id. at 358. When female A.R. was first taken into the DJFS's temporary custody, Michael had not been "receptive" to

taking custody of his daughter due to some of her behaviors, such as sexual acting out and temper/anger problems. Id. at 361. In December 2005, the court ordered that Michael participate in counseling or parenting classes that would help him to deal with female A.R.'s behavioral issues. Although Michael searched for a suitable class, none were offered or otherwise available to him. Id. at 362. Stein and Reiter voiced similar concerns in regard to Michael's pending criminal charges in Hancock County. Stein stated that she may have supported awarding custody to Michael had he disclosed the arrest. Id. at 365. Stein opined that even if the indictment in Hancock County were dismissed, she would not recommend granting custody of female A.R. to Michael because he had not been honest about the charges and the Federal Bureau of Investigation had not finished its background check, which could reveal criminal activity in other states. Id. at 455.

{¶26} Michael testified that he was employed at Scott Foundry earning $12 per hour and working 45 hours per week. Permanent Custody Hearing Tr. II, at 135. His wife, who had been employed as of the November 2008 hearing, had become a homemaker. Michael stated that he had had visitation with female A.R. for approximately two years, and he had moved to Mississippi in 2005 because he had been "frustrated" with the court's decision. Id. at 137; 171. Due to the pending criminal charges in Hancock County, Michael relied on his testimony from the November 2008 hearing. In November, Michael had testified that he had

had nothing to do with female A.R.'s removal from Michelle. Nov. Permanent Custody Hearing Tr., Apr. 15, 2009, at 178. Michael indicated a willingness to help female A.R. with any learning disabilities and to protect his other children from female A.R.'s sexual acting out. Id. at 183-184. Michael told the court that his family was also willing to accommodate female A.R. and was willing to accept her as a part of the family. Id. at 186. When discussing his criminal history, Michael disclosed several prior felony and misdemeanor convictions but did not disclose the arrest that had occurred the day before the hearing. Id. at 192-194.

{¶27} Although the evidence revealed that the home Michael was purchasing with his wife was suitable, and although he was willing to take custody of female A.R., the court had other evidence to consider. The court apparently placed great weight on the fact that Michael had left the state of Ohio and had not had contact with female A.R. for approximately one year following its December 2005 order denying him custody. The court also placed great weight on the need to keep the five children together as a family unit and the Glasses' favorable consideration of adoption. Although the court did not specifically address Michael's criminal background, his numerous convictions, as well as the non-disclosure that he had been arrested in Hancock County the day prior to the November 2008 hearing, surely placed Michael's credibility in doubt. As stated above, there was competent and credible evidence on the record that female A.R.

had been in the temporary custody of the DJFS for twelve months out of a consecutive 22-month period and that it would be in her best interest to be placed into the agency's permanent custody. Because there was clear and convincing evidence on the record from which the trial court could make its determination, we cannot hold that the trial court abused its discretion or that the judgment was against the manifest weight of the evidence. Michael's sole assignment of error is overruled.

{¶28} The judgments of the Seneca County Common Pleas Court Juvenile Division are affirmed.

*Judgments Affirmed*

**PRESTON, P.J., and ROGERS, J., concur.**