[Cite as *In re M.B.*, 2013-Ohio-5668.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:

    M.B.,

CASE NO. 17-13-11

ADJUDICATED ABUSED,
NEGLECTED AND DEPENDENT.

[FLOYD TABORN - APPELLANT].
[TAMMY MURPHY - APPELLANT].

**O P I N I O N**

Appeal from Shelby County Common Pleas Court
Juvenile Division
Trial Court No. 2011-ABU-9

**Judgment Affirmed**

Date of Decision: December 23, 2013

APPEARANCES:

    *Scott A. Kelly* for Appellant, Tammy Murphy

    *James Gudgel* for Appellant, Floyd Taborn

    *Melissa L. Wood* for Appellee

Case No. 17-13-11

**WILLAMOWSKI, J.**

{¶1} Appellant Tammy Murphy ("Murphy"), natural mother of M.B., and Appellant Floyd Taborn ("Taborn"), natural father of M.B., bring this appeal from the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, terminating both of their parental rights as to M.B. For the reasons set forth below, the judgment is affirmed.

{¶2} On May 4, 2011, the Shelby County Department of Jobs and Family Services — Children Services Division ("the Agency") filed a complaint naming the minor child, M.B., and her parents. Doc. 1. Said complaint was based on abuse, neglect, and dependency. *Id.* At that time, M.B. resided with her mother, Murphy. *Id.* A hearing was held and on June 13, 2011, the trial court determined that M.B. was an abused, neglected, and dependent child. Doc. 51, Temporary custody of M.B. was granted to the Agency.[1] *Id.* On February 8, 2012, the Agency filed a motion for permanent custody of M.B.[2] Doc. 75. Murphy filed for legal custody of M.B. on March 28, 2012. Doc. 94. A hearing on the outstanding motions was held on June 21, 2012. Doc. 135. On July 24, 2012, the trial court entered judgment denying Murphy's motion and Taborn's motion for legal custody of M.B. and the Agency's motion for permanent custody of M.B. as regards Murphy. *Id.* The trial court granted the motion to terminate the parental

---

[1] The agency was also granted temporary custody of M.B.'s sisters, T.M. and A.B.
[2] At that time, T.M. was residing with her father and A.B. had been returned to Murphy.

rights of Taborn at that time. *Id.* The temporary custody of M.B. was continued with the Agency. *Id.* Taborn filed his notice of appeal from that judgment on August 7, 2012. Doc. 147. This court reversed the judgment of the trial court terminating the parental rights of Taborn on February 25, 2013. Doc. 198, *In re M.B.*, 3d Dist. Shelby No. 17-12-19, 2013-Ohio-652.

**{¶3}** On December 21, 2012, the Agency filed a new motion for permanent custody of M.B. Doc. 182. This motion alleged that M.B. had been in the custody of the Agency for more than twelve of the prior twenty-two consecutive months and that a granting of permanent custody would be in the best interest of M.B. *Id.* Murphy then filed a renewed motion to have custody of M.B. returned to her. Doc. 185. The Agency filed a further motion for permanent custody of M.B. on March 26, 2013.[3] Doc. 215. On April 4, 2013, Murphy filed a renewed motion to have permanent custody of M.B. granted to her. Doc. 228.

**{¶4}** On April 16, 2013, Paula Zimmerman acting in her capacity as the guardian ad litem ("the GAL"), filed her report. Doc. 250. The report indicated that the GAL maintained monthly contact with M.B. and described her as "a pretty, thriving, mentally challenged 10 year old approaching adolescence." *Id.* at 1. The GAL report also indicated the following statements concerning Murphy.

> **I have at least monthly contact with [Murphy] in this case. I have met with her in formal and informal settings, at meetings at**

---

[3] A further motion was necessary after the prior ruling terminating Taborn's rights was reversed on appeal.

> **CSD, supervised visitations, and in her home. [Murphy] requires the assistance of a CSD case manager, an in home case manager, and the assistance of an in home counselor to parent [M.B.] appropriately. [Murphy] remains firmly convinced that she's an able parent independent from the case of care givers that surrounds and guides her. [Murphy] has chosen to allow a man who calls himself John Reed to live with her in her household. Although the case plan has dictated that anyone living in the household needs to be fingerprinted, John has avoided this task since last August. He remains an unknown figure in the household in direct defiance of the case plan. [Murphy] allowed friends to live with her in February, one of whom was discovered to be a registered sex offender in the state of Washington. [Murphy's] understanding of the concerns of CSD and the case plan is limited at best. [Murphy] was the victim of John Reed's drunken behavior and assault in December. The Sidney City Police were called to the house on North Ohio twice in a weekend. No charges were filed and [Murphy] and John are OK with their continued living arrangement. [Murphy] has no validated consistent employment and would not be able to sustain her current household without the financial assistance of John Reed or some other resource.**

*Id*. at 1. During the visits between Murphy and M.B., M.B. frequently manipulates Murphy until Murphy loses control of the situation. *Id.* at 2. The GAL also made a statement concerning Taborn.

> **I have had only two contacts with [Taborn] other than our shared presence in the courtroom. We were in a Primary Care Team Meeting at Children's Services together once. Later, I observed a visitation in the summer of 2012 after which I voiced my concern about [Taborn's] parenting style to the case manager who was present. I observed the [sic] [Taborn's] only way of interacting with [M.B.] consisted of having her sit on his lap while he attempted to tickle her. This observation was corroborated recently when the case manager told [Taborn] that it was inappropriate for him to have [M.B.] sit on his lap while**

> **he placed his hands on her breasts. [Taborn] has yet to follow any of the case plan objectives. He has outright failed or failed to accomplish at least four drug screens, has no validated domicile, and has no reported income. [Taborn] has been verbally angry with CDS and has hung up on Barb Reindel when she attempted to discuss the case plan with him.**

*Id.* at 2-3. After speaking with numerous people involved in the process and reviewing Murphy's psychological evaluation, the GAL made her recommendation.

> **I find that the biggest change in this case is that NOTHING has changed except that [Murphy] has added an unidentified male over 30 to her household. The only thing we know about this man is that he says his name is John Reed. [Murphy] encourages John to continue living with her and her teen-aged daughter, [A.B.], knowing that this is in violation of the case plan. [Murphy] does not have an income. [Murphy's] three case persons from different agencies agree that without daily intervention, [Murphy's] decision making and parenting skills are not sufficient to manage to maintain the safety of a child with significant developmental delays that fall in the range of severe mental retardation. The observation from direct service providers align with those of Dr. Hrinko in his psychological evaluation of [Murphy]. [Murphy] has not made her household a safe and nurturing place for [M.B.] whose needs are different from [Murphy's] other children. During the last three months [Murphy] has been accosted by the drunken behavior of her male housemate, and she spent several days in the Shelby County Jail as a result of a probation violation.**

> **As a result, I recommend that [the Agency] be granted permanent custody of [M.B.].**

*Id.* at 3.

{¶5} The permanent custody hearing was held on April 23 and 24, 2013. Tr. 9. The first witness to testify on behalf of the Agency was Lindsey Moore ("Moore"). Moore testified that at the time of the hearing, she was an ongoing caseworker for Montgomery County Children Services. Tr. 14. Moore testified that M.B. entered into the temporary custody of the Agency in May of 2011. Tr. 16. She also testified that M.B. has developmental disabilities. Tr. 16. Although Murphy was generally compliant with the services provided at the time of the appointments, she did not follow through with the directions she was given when on her own. Tr. 17-18. Moore also testified that there was an issue with Murphy lying to the Agency. Tr. 18-19. When Moore left the Agency, her concerns as to Murphy were that she did not follow through with services and that she allowed people into her home who were not safe for M.B. to be around even after she was requested not to do so. Tr. 22. Although A.B. and T.M. were permitted to visit with M.B., they rarely came to the visits. Tr. 23. Moore left the employ of the Agency in March of 2012. Tr. 24.

{¶6} Moore testified that the Agency had requested that Taborn complete a psychological evaluation, complete a drug and alcohol assessment, submit to random drug screens, complete a parenting education course, maintain stable housing and employment, and be consistent with visitation. Tr. 19. Although Taborn completed the psychological evaluation, to Moore's knowledge he did not

follow the recommendations. Tr. 19. Moore testified that while she was the caseworker, Taborn had not participated in any other services and was inconsistent with visitation. Tr. 19. Moore reported that when she left her position as caseworker, she had concerns about Taborn parenting M.B. Tr. 21.

> **[H]e didn't have any stable housing or income at the time of my leaving so he would have had no way of providing for [M.B.]. Um, he also was unwilling to complete drug and alcohol assessments or drug screens so his drug use was not - - was unknown to me and he also was very defiant when working with parenting coaches or other people in - - in ways to interact with [M.B.] and ways to redirect her with her disability, um, so I would have had a lot of concerns with him having custody of M.B.**

Tr. 21-22. Moore also testified that there had been a prior police report for Taborn striking M.B. and that at that time he was found to have marijuana on him. Tr. 22.

{¶7} On cross-examination, Moore testified that Murphy was faithful in participating in services and if she had to miss, Murphy notified Moore in advance and provided an excuse. Tr. 27. Moore also agreed that Murphy was completing the tasks requested of her. Tr. 28. In Moore's opinion, Murphy did well with M.B. as long as there was someone to direct her during the interactions. Tr. 28. Murphy did not miss visitations with M.B. and there is a bond between the two. Tr. 30. Moore testified that Murphy interacted well with M.B. at visits and spent the whole time playing or talking with M.B. Tr. 31. As to Taborn, Moore testified that at the beginning of the case plan, Taborn came to most visitations.

Tr. 32. However, by the time she left the Agency, Taborn had attended "under fifty percent of the available visitations." Tr. 33. His visitation declined after he was required to call an hour in advance of the visit to let them know that he intended to attend. Tr. 33. Moore denied that she saw anything inappropriate in Taborn's behavior that would have caused the visits to be stopped. Tr. 34.

{¶8} The second witness for the Agency was Betty Hoaglin ("Hoaglin"), who was the foster mother of M.B. Tr. 39-41. Hoaglin testified that M.B. has resided with them since May of 2011. Tr. 42. When M.B. arrived, she would just sit on the couch and watch everything without participating. Tr. 42. M.B. was not able to use the bathroom by herself, to dress herself, or to bathe herself. Tr. 42. M.B. did not seem to know how to play and was overweight when she arrived. Tr. 42-43. Since M.B.'s arrival, she has bonded to the members of her family. Tr. 45. Hoaglin testified that M.B. has lost weight and seems happy at their home. Tr. 43-45. Hoaglin testified that after evening visits and in-home visits were started, M.B. began wetting herself more. Tr. 46.

{¶9} The third witness was Irene Cooper ("Cooper"), who was M.B.'s teacher for three years. Tr. 57. Since M.B. was removed from Murphy's care, she is thinner, wearing clean clothing and seems happy. Tr. 61. Cooper also testified that recently M.B. has become more outgoing and will join in the activities with the other children. Tr. 61. Although M.B. is developmentally delayed, she has

made progress academically. Tr. 62. Cooper testified that Murphy has not attended any recent meetings regarding M.B., but Hoaglin is active in supporting M.B.'s progress. Tr. 64.

{¶10} Jenny Smith ("Smith") testified that she was the school physical therapist who worked with M.B. Tr. 80-83. Smith testified that she had worked with M.B. for four years and that M.B. has decreased strength overall, decreased balance, and decreased coordination. Tr. 83. Over the prior year, M.B.'s balance and strength have improved. Tr. 84. M.B.'s "attitude" and willingness to participate in the therapy has greatly improved. Tr. 84. Smith testified that it is possible that M.B. would no longer require physical therapy within the next year. Tr. 85. Although Smith has worked with M.B. for multiple years, she does not recall ever speaking with Murphy. Tr. 90. In contrast, she has spoken with Hoaglin on multiple occasions. Tr. 90.

{¶11} The next witness for the Agency was Janice Geise ("Geise"). Tr. 91. Geise testified that she was the in-home coach for Murphy and Taborn. Tr. 93-94. Geise had been working with Murphy since October 2012 and with Taborn since the end of February 2013. Tr. 93. The work with Taborn is done at the Agency since Geise did not know where Taborn lived. Tr. 94. To assist Taborn, Geise supervised his visits with M.B. Tr. 94. Geise reported that Taborn missed half of the visits. Tr. 94. At the visits Taborn is required to bring in healthy snacks or a

meal and to assist M.B. with her homework. Tr. 95. Taborn brings healthy snacks and does help M.B. with her homework. Tr. 95. On occasion, Taborn has gotten angry with Geise when she instructs him to discipline M.B. and he does not agree that M.B. has done anything wrong.[4] Tr. 95. Geise testified that M.B. is not able to protect herself by establishing appropriate boundaries with people. Tr. 96. This has led Geise to conclude that Taborn cannot appropriately parent M.B. Tr. 97.

{¶12} The visits with Murphy were originally at Murphy's home, but were moved to the Agency in December. Tr. 97. The visits were occurring twice a week, though no visits were done in April of 2013. Tr. 97. Geise testified that she works with Murphy on issues of nutrition and basic parenting. Tr. 98. During a typical visit, Geise would require Murphy to help M.B. with her homework and to provide supper for M.B. Tr. 98. After supper, they were allowed to visit, but eventually Murphy was expected to help M.B. with her shower. Tr. 98-99. Geise testified that Murphy did what was requested of her. Tr. 99. When Geise would help Murphy make a menu for the meal, it was appropriate, but when left on her own, Murphy would provide fried foods and no vegetables. Tr. 99-100. Geise also testified that Murphy is capable of appropriately disciplining M.B. when directed, but if not directed, there is frequently no discipline for bad behavior. Tr. 101. Murphy applies what she has learned when reminded, but does not maintain

---

[4] In the instance discussed in the testimony, Geise was unhappy that Taborn did not reprimand M.B. for calling Geise a witch because he thought it was funny. Tr. 95.

it at other times. Tr. 102. As to the sisters, Geise testified that A.B. is good with M.B., but T.M. does not show interest in M.B. Tr. 102. Neither sister had attended recent visits. Tr. 103.

{¶13} On cross-examination, Geise testified that she does not see affection from M.B. towards Murphy. Tr. 107. Geise also has not observed any affection between M.B. and her sisters. Tr. 107-08. The home is clean and there is food available at the visits. Tr. 108. In addition there are no physical limitations that causes concern for M.B.'s safety. Tr. 108. Geise's concerns about discipline are because rather than placing M.B. in time out when there is an issue, Murphy will argue with M.B. Tr. 112. Geise's concerns were that Murphy could not adequately protect M.B. from T.M. when she visits and that without appropriate discipline, M.B. would end up "in real trouble" in the future. Tr. 113. She also testified that Taborn's missed visits may have been due to work. Tr. 120. When Taborn is helping M.B. with her homework, he will attempt to discipline M.B. when she avoids doing her work, but he does not know what she is capable of doing. Tr. 120.[5] Taborn did bring healthy snacks as requested. Tr. 120.

{¶14} The sixth witness for the Agency was Jodi Knouff ("Knouff"). Tr. 128. Knouff testified that she is a social worker who has provided home based counseling services on two separate occasions. Tr. 129-130. The first time was

---

[5] Taborn's visits were terminated in July of 2012 and were not restarted until February 28, 2013, when this court reversed the prior ruling of the trial court terminating Taborn's parental rights.

from June of 2011 until February of 2012, and then October of 2012 until the time of the hearing. Tr. 130. The first round of counseling was done twice a week, but the second time was only once a week. Tr. 131. During the first round of counseling, Knouff worked with Murphy on decision making skills, coping, and relationship building. Tr. 132. Murphy was very cooperative during the first sessions. Tr. 132. During the second round of counseling, Murphy was less cooperative and missed several meetings. Tr. 132. Knouff testified that during the first sessions, she engaged in modeling appropriate behavior and talk therapy. Tr. 133. At that time, Murphy was open to suggestions, but seemed to be in denial about some of her parenting deficits, specifically poor decision making. Tr. 134. Knouff testified that Murphy did well when given concrete direction and someone was present to supervise, but does not do well when on her own. Tr. 134. During the second session, the problem with denial was still present, but was worse because Murphy was "more resistant to change". Tr. 135. Although Murphy had made progress, she lacked consistency with the progress. Tr. 138. Knouff testified that based upon what she had observed, she did not feel that Murphy could meet M.B.'s needs. Tr. 139.

{¶15} On cross-examination, Knouff admitted that Murphy had made "notable" progress during the first session of counseling. Tr. 141. During the second round of counseling, Knouff does not have the opportunity to see Murphy

and M.B. interacting. Tr. 142. Knouff testified that she had seen a mother-daughter bond between Murphy and M.B. Tr. 142. Knouff also testified that Murphy has some level of commitment to M.B., but was not sure of the level. Tr. 151.

{¶16} Candice Mitchell ("Mitchell") was the seventh witness to testify for the Agency. Tr. 158. Mitchell testified that she had acted as a family coach for Murphy. Tr. 159. She only worked with Murphy for one month, October 2012. Tr. 160. During one of the visits, Murphy told M.B. that she could not have a snack. Tr. 161. M.B. responded by biting herself and would not stop until forced to do so by Mitchell and Murphy. Tr. 161. Murphy then treated the bite wound. Tr. 161. Murphy's typical response to this type of behavior is to "kind of" panic. Tr. 161. Mitchell testified that in her presence, Murphy was consistent in making M.B. behave. Tr. 162. Mitchell also testified that the visits which involved T.M. were unpleasant, but that A.B. did well with M.B. when T.M. was not present. Tr. 163. Mitchell chose to end the visits at the home because she felt threatened by T.M. Tr. 163-65.

{¶17} On cross-examination, Mitchell testified that the home was clean and appropriate and that there was food available. Tr. 168. The specific goals Mitchell was trying to accomplish were to have Murphy learn to feed M.B. proper meals, help M.B. with homework, and help M.B. with her personal hygiene. Tr.

168. In the month, there was no improvement, but there were no new concerns either. Tr. 169. Mitchell testified that her biggest concern was how the household residents became stressed by the presence of T.M. when she was there. Tr. 169. In general, Murphy seemed capable of disciplining M.B. Tr. 170. Mitchell testified that at some times, Murphy was able to make good choices by herself, but at other times, she needed prompts from Mitchell. Tr. 171. Mitchell testified that there was a bond between Murphy and M.B. and that M.B. was really happy to see Murphy and did not want to leave. Tr. 172. Mitchell also observed a bond between M.B. and her sisters. Tr. 173. Mitchell also testified that she believed Murphy to be committed to M.B.'s welfare. Tr. 173. Mitchell was unable to offer any testimony concerning Taborn because she had not worked with him. Tr. 174.

{¶18} The eighth witness for the Agency was Sharon Spitler ("Spitler") who was the case manager assigned to assist Murphy to become more independent. Tr. 177-78. Spitler did not work with Taborn or have interaction with him in any manner. Tr. 179. Spitler began working with Murphy on January 2, 2013. Tr. 179. Spitler's goal was to help Murphy sign up for benefits to allow her to live independently. Tr. 18. Of the fifteen appointments scheduled with Murphy since January, Murphy had attended only three. Tr. 180. Although Murphy was cooperative at the meetings, she did not follow through with the plan. Tr. 180-81. Murphy had met none of the goals set. Tr. 181. Spitler testified on

cross-examination that the Murphy household does not appear to be lacking any necessities and that her rent and utilities have been paid by Murphy and the others residing in the home. Tr. 182-83. Spitler testified that the rent was paid by Murphy's boyfriend, John Reed ("Reed"). Tr. 184.

{¶19} For the next witness, the Agency presented the testimony of Emily Broering ("Broering"), who is the probation officer for Murphy. Tr. 186, 189. As a result of a felony conviction for child endangering, Murphy was placed on probation, which required her to comply with the case plan. Tr. 190-92. Broering testified that Murphy has violated the terms of her probation on two occasions. Tr. 192. The first violation was for allowing a convicted felon into her home. Tr. 192. The second violation was for failing to notify Broering of police contact when she was a victim of domestic violence by Reed. Tr. 194. Other than the two incidents, Murphy is cooperative with the terms of her probation. Tr. 200.

{¶20} Amber McCullough ("McCullough") testified next. Tr. 203. McCullough testified that she is an intake caseworker for the Agency. Tr. 204. McCullough testified that she responded to a report of domestic violence in Murphy's home in December of 2012. Tr. 205. When McCullough interviewed Murphy, Murphy admitted that she had been concerned for her safety due to Reed's temper when he was drinking. Tr. 206-07. McCullough testified that T.M. and A.B. told her that Reed does not bother them and they will stand up to him

more than Murphy will. Tr. 207. McCullough was told by A.B. and T.M. that the incident started when Murphy told Reed she did not want to drink with him, he pushed her, and she fell hitting her head on the microwave stand. Tr. 209. The police were then called and told Reed to go upstairs and stay there. Tr. 209. The second time the police were called, they told Murphy and Reed that if they had to come back again, someone would be arrested and provided Murphy with information about a domestic violence shelter. Tr. 210. On cross-examination, McCullough testified that she had no firsthand knowledge as to what happened, but was testifying to what she had been told by Murphy, Reed, A.B. and T.M. Tr. 213. In addition, McCullough has reviewed the police report. Tr. 214. As a result of the incident, no new allegations of abuse, neglect or dependency were brought. Tr. 216.

{¶21} The next witness for the Agency was Lieutenant Cori Steiner ("Steiner") of the Shelby County Sheriff's Office. Tr. 223. Steiner testified that James Cullum came to the office to register that he would be staying at Murphy's address. Tr. 225. The man was a sex offender out of Washington, so had to report. Tr. 225. The address was too close to a school, so he was not allowed to stay there. Tr. 226. Steiner testified that the man left town immediately to return to Washington and his arrival in Washington on the bus was verified by the man's probation officer in Washington. Tr. 226-27. Steiner testified that she was not

-16-

sure of the exact offense but believed it was "child molest". Tr. 227. Steiner also did not know if it was a felony. Tr. 228. Steiner also did not know whether the man actually ever stayed at the address. Tr. 228.

{¶22} The twelfth witness for the Agency was Aja Sanford ("Sanford"), who was the probation officer for A.B. Tr. 230-31. Since A.B. was placed on probation on December 20, 2011, she has had two violations. Tr. 232. Sanford testified that Murphy has "pretty much" complied with the terms of A.B.'s probation, but has not been able to control A.B. Tr. 232-33. Sanford had concerns about the "older men" visiting the home and Murphy's honesty regarding this.[6] Tr. 233. On cross-examination Sanford testified that Murphy had improved in her discipline of A.B. Tr. 235. Since being returned to Murphy, A.B. has complied with probation and improved her grades. Tr. 235. Sanford testified that A.B. is not a risk for children around her. Tr. 236. When it comes to compliance, Murphy must be reminded of the rules. Tr. 236. Once Murphy is reminded, she does follow the rules. Tr. 236.

{¶23} Barb Reindel ("Reindel") testified that she was the ongoing caseworker assigned to M.B.'s case. Tr. 244. Reindel began as the caseworker on August 10, 2012 and continued through the hearing date. Tr. 245. M.B. entered the custody of the Agency on May 4, 2011, and has remained in it continuously

---

[6] "Older" was defined by Sanford as anyone over eighteen. A.B. has had relationships with men between the ages of 20 and 30 which caused concern for Sanford. Tr. 238.

through the hearing date. Tr. 245. Reindel testified that the identified issues with Murphy were parenting limitations, a lack of independence, poor relationship choices, and safety in the home and family. Tr. 246. Other than the numerous services already provided to Murphy, Reindel could not think of any other services which would assist Murphy. Tr. 247-48. The home-based services provided included weekly counseling. Tr. 249. The result shows that since October of 2012, Murphy has attended ten of twenty-five possible appointments and has shown little measurable improvement. Tr. 249. Reindel testified that in her opinion Murphy would be unable to provide for M.B. without continued professional support. Tr. 249.

{¶24} In addition to the counseling, Murphy was provided parent education and support during visitation. Tr. 250. Reindel testified that Murphy's compliance rate for attendance was "in the upper seventy percentile." Tr. 250. The Agency still has concerns about Murphy being able to consistently demonstrate parenting skills such as appropriate discipline and nutrition without support from the parent educator. Tr. 250. Murphy has also shown little compliance and improvement in the area of independently providing for her family. Tr. 251. Rather than seeking assistance to pay her rent, she relies on male partners with unknown histories to pay her rent. Tr. 251. This is a concern, according to Reindel, because of the domestic violence incident that occurred in

December of 2012. Tr. 251. Finally, there was an issue with the home being infested with bedbugs as of March 2013, which is a health concern. Tr. 252. Reindel is concerned because Murphy does not tell the Agency about the problems and only works with the Agency when its employees learn about the issues from outside sources. Tr. 252-53.

{¶25} Reindel testified that Murphy has allowed Reed to live with them for almost a year. Tr. 253-54. He has not complied with requests for a background check. Tr. 254. All Reindel knows about Reed is that Murphy says "he's a good man because he pays the bills." Tr. 253. Reindel testified that she had concerns regarding Reed's "alcohol use, the domestic violence and the unknown." Tr. 255.

{¶26} When questioned about Murphy's employment, Reindel testified that she had concerns. Tr. 256. As part of the case plan, Murphy was to establish independence by finding employment. Tr. 256. Murphy told Reindel that she was working for her landlord, but has provided no verification. Tr. 257. The only verification of employment from the household has been from Reed. Tr. 257. Reindel testified that she spoke with Murphy's landlord who told her that although Murphy cleans apartments as needed, she does not work for him on a regular basis. Tr. 258.

{¶27} As to Taborn, Reindel testified that she has concerns about his criminal record, drug abuse issues, homelessness, hostility towards service

providers, and parenting skills. Tr. 260-61. She testified that she could not really offer Taborn services because he would not establish a "working relationship" with her. Tr. 261-62. Reindel admitted that there was a seven month time period where services were not offered due to the appeal process. Tr. 262. However, there was no progress from the initial plan in 2011 until July of 2012, and none since February of 2013. Tr. 262. The only requests completed by Taborn was that he had a psychological evaluation and has submitted to one drug screen on March 1, 2013, which was positive for marijuana. Tr. 262-63. Services were reinstated for Taborn as of February 28, 2013. Tr. 263. When speaking with Taborn, Reindel testified that she would consider him to be verbally aggressive. Tr. 264. Reindel testified that she was not sure if Taborn really wanted custody of M.B. or just wished to see her. Tr. 265.

{¶28} Reindel testified that she is familiar with M.B. and sees her at least monthly, but usually more. Tr. 265. Reindel testified that M.B. cannot protect herself and requires more care than the average child. Tr. 265. When questioned about the relationship between the family members, Reindel testified as follows.

> **I would describe [Murphy] and [M.B.'s] relationship as, um, one where [Murphy] is very close to her daughter, very much cares for her daughter, um, loves her daughter. Um, over the course of my involvement I think [M.B.] enjoys seeing her mother, um, I think that she realizes or believes in her mind that that's not her home, that's not her primary caregiver and she is, um, enjoys seeing her mom but she is very definitely ready to go home, as she refers to the foster care givers' residence.**

-20-

**Q. And how would you describe [M.B.'s] relationship with her sister [A.B.]?**

**A. They are, um, - - it is a good relationship, [A.B.] spends time with her. Um, during my monitoring of those first visits at the time of my assignment [A.B] paid a lot of attention to [M.B.] and [M.B.] liked that attention - - painting her nails and talking to her and, you know, playing with the family pets, that sort of things. Over the course of time [A.B.'s] contact with [M.B.] has significantly dropped off. Um, initially [M.B.] would ask more about [A.B.] but not so much as of recent to my knowledge. I think they are close, um, but I don't know that I would classify it as an extremely bonded relationship.**

**Q. Okay. And what about her other sister, [T.M.]?**

**A. My contact with [T.M.] has been somewhat more limited but I have had some contact. I find [T.M.] very defiant, very unruly, um, I think she is a bad influence on [M.B.]. I know that [M.B.] has gone back to her foster care giver after contact with [T.M.] and the attitude of [M.B.] presents that attitude that [T.M.] presented. Um, [T.M.] doesn't really come to visit and interact with [M.B.] - - there's more of a "what can you do for me mom and I'm out of here as soon as I get it". That's the type of relationship I see, one of convenience.**

Tr. 265-67. Reindel testified that M.B. is very secure in her foster placement and has done well in the placement. Tr. 268.

{¶29} On cross-examination, Reindel testified that Murphy has cognitive limitations, but does have some parenting skills. Tr. 284-86. Reindel also testified that Taborn's visitations were not restarted with M.B. until March 14, 2013. Tr. 288. She also stated that the address she had for Taborn appeared to be

incorrect. Tr. 290. Reindel indicated that Taborn had failed to attend agency meetings and IEP meetings for M.B. Tr. 292.

{¶30} The final witness to testify on behalf of the Agency was the GAL. The GAL testified that when she first met M.B., she was badly burned, unresponsive to questions, and grossly overweight. Tr. 295. M.B. also was very sedentary and did not like to be active. Tr. 295. As of the hearing date, the GAL described M.B. as a smiling child who is responsive to questions and has recovered from her injuries. Tr. 295. M.B. is very active now and behaves more like a typical ten year old child. Tr. 296. The GAL testified that M.B. is very limited in her cognitive abilities and will need life-long personal care as she will not live independently. Tr. 296. According to the GAL, M.B. was not able to state her wishes because she cannot comprehend the proceedings. Tr. 297. The GAL expressed concerns about Murphy's ability to pay necessary expenses for housing and food on what she earns in a week. Tr. 300. When asked about Murphy's ability to parent M.B., the GAL testified that based upon what she has seen, M.B. is the person in charge, not Murphy. Tr. 302. The GAL recommended giving permanent custody of M.B. to the Agency. Tr. 302.

{¶31} When questioned about Taborn, the GAL testified that she had only observed Taborn with M.B. on one occasion.[7] Tr. 297. At that time, she was concerned that Taborn would tickle M.B. while M.B. was sitting on his lap as she found it inappropriate. Tr. 297. Her only other interaction with Taborn, outside of court appearances, was one primary care team meeting at the Agency. Tr. 298. Her opinion on Taborn was formed on his inactivity in the case, his lack of known address, his unemployment, and his substance abuse issues. Tr. 298. Thus, she would not recommend that Taborn be given custody of M.B. Tr. 298.

{¶32} On cross-examination, the GAL indicated that she was last in Murphy's home in March of 2013. Tr. 305. However, the last time she saw Murphy and M.B. interact was the fall of 2012. Tr. 305. The GAL denied that there was a bond between M.B. and Murphy or one between M.B. and A.B. other than they "knew each other." Tr. 305-307. The GAL admitted that in her mind this has always had the potential to be a permanent custody case from the very beginning. Tr. 308-309. She also admitted that her only observation of Taborn and M.B. interacting was done in the fall of 2011. Tr. 312. The GAL testified that she has had no conversations with Taborn and that she has not tried to find out if he has a residence or a job. Tr. 313. She chose not to do so. Tr. 313. She

---

[7] In her report, the GAL identified the time of this visit as August of 2012. When testifying, she identified it as the fall of 2011. Since Taborn's visitation was terminated in July of 2012, the date set forth in the testimony is more likely.

testified that in her opinion M.B. would stop asking to see Murphy over the course of time. Tr. 314.

{¶33} After the testimony of the GAL, the Agency rested its case. Tr. 315. Murphy then presented the testimony of A.B. and herself. A.B. testified that she is the sixteen year old sister of M.B. Tr. 316-18. A.B. testified that her relationship with M.B. was "pretty good" and that she loves M.B. Tr. 319. She also testified that M.B. loves her and that M.B. will run up to her, hug her, and tell her that M.B. loves her every time they are together. Tr. 319. A.B. testified that she used to go to all the visits, but she was tired of going down to the Agency for the visits. Tr. 320. She admitted that she had not been to the visits in a couple of months. Tr. 320. When questioned about the relationship between M.B. and Murphy, A.B. testified that they get along "pretty great." Tr. 320. A.B. testified that she sees love between Murphy and M.B. Tr. 321. A.B. admitted that she had been in criminal trouble before, had skipped school, and had been failing her classes. Tr. 321-22. She testified that she has turned her life around with Murphy's help and is now getting good grades, likes school, attends school regularly, and is trying to work towards going to college. Tr. 322. A.B. denied that she was afraid of Reed or that the household was unsafe or lacking necessities. Tr. 323-24.

{¶34} Murphy testified on her own behalf. Tr. 335. Murphy testified that the reason for the prior eviction was not that she could not pay the rent, but that

she refused because the landlord refused to fix the ceiling which was falling. Tr. 336-37. Since bedbugs were found in her home, Murphy had not seen M.B. for three weeks because the Agency would not allow her to do so. Tr. 339. Murphy testified that she had only missed three of her twice weekly visits – two due to weather and one due to illness. Tr. 340. Murphy indicated that on all instances she called and told the Agency and that she provided a doctor's note for the instance where she was ill. Tr. 340. Murphy testified that she is dedicated to M.B. and loves her and that M.B. returns that love. Tr. 340-41. According to Murphy, there is a strong bond between herself and M.B. and a strong bond between M.B. and A.B. Tr. 342-43. In Murphy's opinion, she has improved in disciplining the children, feeding M.B. healthy food, and recognizing safety issues. Tr. 344-46. Murphy admitted that she should have sought medical care for M.B. when she was burned rather than trying to treat it herself. Tr. 346.

{¶35} When questioned about her relationship with Reed, Murphy testified that he denied having a criminal past and that he had not been charged with any crimes since she has known him. Tr. 351-53. Since the one domestic violence issue in December of 2012, Reed has not done or said anything that would be considered threatening and no longer consumes alcohol. Tr. 353. Murphy testified that she told Reed that if he drank any more alcohol, he would have to leave. Tr. 354. Murphy admitted that she permitted her friend to stay in her home

for a week. Tr. 356. When she learned that the friend's boyfriend was a sex offender, she made him leave the home immediately. Tr. 357. Murphy testified that she wanted M.B. to live with her and that she believed she could protect and care for the child appropriately. Tr. 360.

{¶36} On cross-examination Murphy admitted that she had some difficulty in controlling her daughter who did not have special needs. Tr. 362-63. She testified that she feels better able to parent now than previously. Tr. 363. Murphy admitted that M.B. is healthier now that she has lost some of the excess weight. Tr. 364. She also admitted that she had met Reed on the internet and that they had only spoken on the phone before he moved from Tennessee to Ohio. Tr. 366.

{¶37} The last witness to testify was Taborn, M.B.'s father. Taborn testified at his first visit in 2013, he was happy to see M.B. and that she was happy to see him. Tr. 380. However, at the recent visits he had attended, M.B. repeatedly asked him where Murphy was and indicated that she wanted to be with Murphy. Tr. 381. Taborn testified that he had missed two visits since having his visitation reinstated, but that it was because he had to work overtime. Tr. 381. Taborn admitted that since he had been returned to the case plan, he had not completed the case plan, but testified that he had not had sufficient time to do so since he was only returned to the case plan at the end of February 2013. Tr. 383.

Taborn also testified that if he could not have custody of M.B., he would like for her to be returned to Murphy. Tr. 383.

{¶38} On cross-examination, Taborn admitted that he would be concerned if M.B. were injured a second time while in Murphy's care. Tr. 386. He also admitted that he had concerns about M.B. going to Murphy's since he did not know Reed. Tr. 388. However, he believed that Murphy could protect M.B. and that Murphy would provide a safe home and meet all the needs of M.B. Tr. 390. Taborn described Murphy as a good mother. Tr. 390. According to Taborn, M.B. loves her mother and sisters very much. Tr. 391.

{¶39} On June 3, 2013, the trial court entered its judgment granting the Agency's motion for permanent custody and terminating the parental rights of Murphy and Taborn.[8] Doc. 268. Taborn filed his notice of appeal from this judgment on June 12, 2013. Doc. 272. Murphy filed her notice of appeal on June 24, 2012. Doc. 280. Both Taborn and Murphy have filed briefs and raise assignments of error.

### Murphy's Assignment of Error

**The trial court erred in terminating the parental rights of [Murphy].**

---

[8] Murphy's motion for permanent custody was denied.

**Taborn's Assignment of Error**

**The Court's decision, when it found that it was in the best interest of the minor child to terminate the parent's parental rights was against the manifest weight of the evidence.**

{¶40} Both assignments of error allege that the trial court's decision to terminate their parental rights was in error. Since they raise the same question, they will be addressed together. The right to raise one's own child is a basic and essential civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169. "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. Permanent custody determinations must be supported by clear and convincing evidence and the appellate courts will review the record to determine whether there is sufficient evidence to satisfy the requisite burden of proof. *In re A.R.*, 3d Dist. Seneca Nos. 13-09-03 through 13-09-07, 2009-Ohio-3536, ¶8. "However, the trial court 'is in the best position to observe the demeanor of the parties, to [assess] their credibility, and to determine the accuracy of their testimony.'" *Id.* at ¶9 (quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367, 481 N.E.2d 613). If the trial court's determination is supported by

competent, credible evidence and the trial court did not abuse its discretion, then the judgment will be affirmed. *Id.*

{¶41} When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include in pertinent part as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **\* \* \***
>
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.**
>
> **For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.**
>
> **\* \* \***
>
> **(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent**

**custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

R.C. 2151.414.

{¶42} In this case, the Agency filed its motion for permanent custody under R.C. 2151.414(B)(1)(d). This section requires that the child have been in the custody of the Agency for twelve out of twenty-two consecutive months. M.B. was adjudicated an abused, neglected, and dependent child on June 13, 2011.[9] Doc. 51. The Agency filed the motions for permanent custody forming the basis of the decision on December 21, 2012, and March 26, 2013. Doc. 182 and Doc. 215. Even using the earlier date of the two motions for calculation, M.B. had been in the custody of the Agency for approximately nineteen of the prior twenty-two consecutive months when the December motion was filed. Having met the statutory requirements of R.C. 2151.414(B)(1)(d), the only question before the trial court and this court is whether the termination of Murphy's and Taborn's respective parental rights is in the best interest of M.B.

{¶43} The determination of the best interest of the child is controlled by R.C. 2151.414(D).

**(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \*, the court shall**

---

[9] This is less than sixty days after M.B. was removed from the home, so is the date to be used in the calculation of time.

**consider all relevant factors, including, but not limited to, the following:**

**(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**

**(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D).  "In a best-interests analysis under R.C. 2151.414(D), a court must consider 'all relevant factors,' including five enumerated statutory factors, one of which is the wishes of the child.  No one element is given greater weight or heightened significance."  *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶57, 862 N.E.2d 816.

{¶44} In this case, the trial court stated in its judgment entry that it considered the appropriate statutory factors, though it did not thoroughly discuss the application of the law to the facts.  The first factor the trial court must consider

is the child's interaction and relationship with parents, siblings, foster care givers, and any other relevant person. The trial court did find that M.B. had developed a close relationship and bonded to the foster family. J.E., 6. The trial court indicated that this relationship now exceeds that of the one between M.B. and Murphy. *Id.* The trial court did not discuss M.B.'s relationship with Taborn or A.B. However, there was testimony provided from which the trial court could conclude that the relationships were not strong. Reindel testified that M.B. loves her mother and Murphy loves M.B., but it is not a relationship where M.B. sees Murphy as her caretaker. Tr. 265-67. Reindel also testified that at the end of the visits, M.B. is ready to go "home" which is identified as the foster placement. *Id.* When questioned about A.B. and M.B.'s relationship, Reindel again identified it as a loving, close one, but not extremely bonded. *Id.* Reindel testified that the relationship she saw between Taborn and M.B. was affectionate in that he wanted to see M.B., but not one where he really wanted custody of her. Tr. 265.

{¶45} The second factor that must be considered is the wishes of M.B. as expressed by her or by her GAL. The GAL testified that she did not ask M.B. her wishes because she did not believe that M.B. would understand. Tr. 297. The GAL stated that in her opinion, it would serve M.B.'s best interests to grant permanent custody to the Agency. Tr. 302. The GAL opined that over time, M.B.

would stop asking to see Murphy. Tr. 314. The trial court recognized that this was the recommendation of the GAL and not the statement of M.B. J.E. 6.

{¶46} The third factor that must be considered is the custodial history of M.B. The record reveals that M.B. had been in the custody of the Agency for almost two years at the time of the hearing. The trial court recognized this fact and indicated that M.B. had "thrived" while in the care of her foster family. J.E. 5.

{¶47} In the fourth factor, the trial court is required to consider the child's need for a legally secure  permanent placement. There was substantial evidence that neither Murphy nor Taborn would be able to parent the child in the near future.  Murphy had not complied with the case plan by failing to find employment, allowing an unknown third party to reside with her, and not being truthful with service providers. All of the providers had the same opinion, that Murphy was not making progress and was unlikely to do so even if given additional time. All of the providers consistently testified that they had concerns with returning M.B. to Murphy given M.B.'s limited cognitive functioning. As to Taborn, the evidence was that when he was on the case plan, he made almost no progress. The only provision with which he had complied was that he "obtain a psychological evaluation". The evidence presented was that Taborn was inconsistent with visitation both before the first termination and in the six weeks from his reinstatement to the case plan and the final hearing. As of the hearing,

Taborn was living with family members and had only been working for less than a month. The only drug screen he had taken was positive for marijuana usage. Although there was no testimony concerning the likelihood of M.B. being adopted, the evidence presented showed that M.B. was not likely to receive stability from Murphy and/or Taborn in the near future and that she did have a stable placement in the foster home.

{¶48} The final mandatory factor is whether any of the factors set forth in R.C. 2151.414(E)(7-11) apply. The evidence shows that Murphy had been convicted of felony child endangering for failing to seek medical treatment for M.B. when she was burned. Tr. 190. Thus, the factor in (E)(7) applies to Murphy.

{¶49} The trial court determined that after considering the relevant factors, "including those set forth in R.C. 2151.414(D)(1)(a)-(e) and R.C. 2151.414(E)(7)-(11)", that there was clear and convincing evidence to find that it was in the best interest of M.B. to terminate the parental rights of Murphy and Taborn. As there is competent and credible evidence to support this determination by clear and convincing evidence, the trial court did not abuse its discretion. The judgment of the trial court must be affirmed. The assignments of error raised by both Murphy and Taborn are overruled.

{¶50} Having found no error prejudicial to the appellants in the particulars assigned and argued, the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**